**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

**JOHN BERENE and**                  **CASE NO.:   14-61153-CIV-SCOLA**
**CAMRON LONGSON,**

    **Plaintiffs,**

**vs.**

**NATIONSTAR MORTGAGE LLC,  BALBOA INSURANCE**
**COMPANY, QBE HOLDINGS, INC. QBE INSURANCE CORPORATION,**
**QBE FINANCIAL INSTITUTION RISK SERVICES, INC.,**
**NEWPORT MANAGEMENT CORPORATION,**
**AND LEXINGTON INSURANCE COMPANY.**
**All Foreign Corporations,**

    **Defendants**
_____/

## SECOND AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

Plaintiffs John Berene and Camron Longson by and through undersigned counsel hereby

file their Amended Complaint. Plaintiffs sue Defendants Nationstar Mortgage LLC, Balboa

Insurance Company, and Lexington Insurance Company, QBE, Financial Institution Risk Services,

Inc. QBE Holdings Inc., Newport Management Corporation, and Lexington Insurance Company

and allege as follows:

### THE PARTIES, JURISIDICTION, AND VENUE

1.     Plaintiffs John Berene and Camron Longson are natural persons over the age of

21.  They are citizens of the State of Florida and reside in Broward County, Florida. These

Plaintiffs will be referred to hereafter as "Borrowers."

2.     Defendant Nationstar Mortgage LLC is a Delaware limited liability company

whose members, also Delaware limited liability companies.  This Defendant and its members

are wholly owned by NSM Holdings Inc., a Delaware corporation with its principal place of

business in the State of Texas. Defendant Nationstar Mortgage LLC is also the successor in

interest to Aurora Loan Services LLC., which has become insolvent since it engaged in all of the acts and omissions that are relevant to this lawsuit. Defendant Nationstar Mortgage LLC is engaged in servicing federally related mortgage loans secured by real property throughout the United States and the State of Florida, including the territorial jurisdiction of this Court.  As a mortgage servicer, it is subject to specific federal laws and administrative regulations governing its mortgage serving activities. These laws and regulations include, but are not limited to, the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 *et. seq.* (hereinafter RESPA) and Regulation X, 12 C.F.R part 1024, hereinafter "Regulation X."

    3.      At all material times, Defendant Nationstar Mortgage LLC, or its predecessor Aurora Loan Services, LLC, serviced Borrowers' mortgage loan secured by real property located in Broward County, Florida.   Nationstar engages in substantial business activity in the State of Florida and the territorial jurisdiction of this Court, and is therefore subject to this Court's jurisdiction.  Defendant Nationstar Mortgage LLC will be referred to hereafter as "Nationstar" and Aurora Loan Services LLC will be referred to hereafter as "Aurora."

    4.      Defendant Balboa Insurance Company is a California corporation with is principal business in the State of California. This Defendant is a Florida licensed insurance company and engages in substantial business activities throughout the State of Florida and the territorial jurisdiction of this Court.  At all material times prior to June of 2011, Balboa was a wholly owned subsidiary of Bank of America Corporation. Since June of 2011 Balboa was acquired by QBE Holdings Inc.

    5.      Defendant QBE Holdings Inc. is a Delaware corporation with its principal place of business in the State of New York.  This Defendant is an insurance holding company that actively manages its subsidiaries' activity.  This Defendant engages in substantial business activities, including but not limited to business activities relating to force-placed insurance,  throughout the United States, including the State of Florida and the territorial jurisdiction of this Court.  This Defendant uses a number of different subsidiaries, including QBE Financial Institution Risk

Services, Inc. d/b/a QBE FIRST and Newport Management Corporation, in furtherance of its force-placed insurance business activities.  This Defendant exercise a high degree of control over its subsidiaries' force-placed insurance related activities, and even maintains a number of different insurance policies in which it is a named insured and which it contends provide coverage for its force-placed insurance related activities.  As discussed extensively in litigation currently pending in the Supreme Court for the State of New York, QBE Holdings has funded the defense of a number of lawsuits and state regulatory investigations brought against QBE subsidiaries concerning force-placed insurance activities, and it claims that is entitled to insurance coverage under the insurance policies it maintains as a result.   Some of these force-placed insurance  related actions were litigated in the United States District Court for the Southern District of  Florida, which demonstrates that this Defendant engages in business activities, and tortious   conduct, within the territorial jurisdiction of this Court.   This Defendant is both directly liable for its agents' force-placed insurance related activities that give rise to Plaintiffs' claims, and   vicariously liable for its agents' conduct.  This Defendant will be referred to hereafter as "QBE   Holdings."

5.      Defendant QBE Insurance Corporation is a Pennsylvania corporation with its principal place of business in the State of New York.   This Defendant is a Florida licensed insurance company doing business throughout the State of Florida, including the territorial jurisdiction of this Court. This Defendant is a party to a series of agreements whereby it assumed all of Balboa's assets and liabilities relating to force-placed insurance in June of 2011, and also assumed management responsibility for all of Balboa's force-placed insurance business

activities. This Defendant is also a wholly owned subsidiary of QBE Holdings Inc., and acted as its agent for purposes of pursuing force-placed insurance business activities in the State of Florida.  This Defendant's assumption of Balboa's assets and liabilities was done in the course and scope of its agency relationship with QBE Holdings and on QBE Holdings' behalf. This Defendant will be referred to hereafter as "QBE Insurance." This Defendant is directly liable to Plaintiffs because it has assumed Balboa's liabilities as of June, 2011.

6.      Defendant QBE Financial Institution Risk Services Inc. d/b/a QBE FIRST is a Delaware corporation with its principal place of business in the State of Georgia. It engages in substantial business activity in the State of Florida, including the territorial jurisdiction of this Court.  Since June of 2011 this Defendant has been a wholly owned subsidiary of QBE Holdings Inc., and operates as an agent and instrumentality of QBE Holdings for purposes of pursuing force-placed insurance business activities in the State of Florida.   Since June of 2011 through the present time, this Defendant has been primarily responsible for supervising the various vendors, including Newport Management, that provide insurance tracking services to mortgage servicers, and is directly liable to Plaintiffs because its omissions in 2014 contributed to their injuries that give rise to their claims in this action. This Defendant will be referred to hereafter as QBE FIRST.

7.      Defendant Newport Management Corporation is a California corporation with its principal place of business in the State of California. Prior to June of 2011, this Defendant was a wholly owned subsidiary of Bank of America Corporation. Prior to the June 2011 transaction between Bank of America Corporation and QBE Holdings, this Defendant was an alter-ego of Balboa, it had the exact same officers and directors, and many (if not all) of the employees of one entity also worked for the other.   This Defendant provides outsourced insurance tracking

services to mortgage servicers, including at all material times to Aurora, on a subsidized basis as part of a quid pro quo arrangement in exchange for the mortgage servicers' selection of Balboa, QBE, or another Balboa affiliated insurance company, to provide force-placed insurance to the loans within their mortgage servicing portfolio at an inflated cost, while passing the inflated force-placed insurance premiums on to the affected borrowers and the investors who own those borrowers' mortgage loans.   This Defendant will be referred to hereinafter as Newport Management.

8.      QBE Holdings,  QBE Insurance,  QBE FIRST, and Newport Management will be referred to collectively as "the QBE Defendants."

9.      Defendant Lexington Insurance Company is a Delaware corporation with its principal places of business located in the states of Massachusetts and Delaware.  It is authorized by the Florida Department of Financial Services to sell surplus lines insurance policies in the State of Florida, and routinely issues insurance policies insuring property within the State of Florida and the territorial jurisdiction of this Court, and is therefore subject to its jurisdiction. Defendant Lexington Insurance Company will be referred to hereafter as "Lexington."

10.     This is an action for damages in excess of $75,000, exclusive of interest, attorney's fees, and costs. Accordingly, this Court has diversity jurisdiction pursuant to 28 USC § 1332 over all defendants.  In addition, Borrowers assert claims against Nationstar under the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2601 *et. seq.* and related claims under the common law of the State of Florida that arise from the same transaction and occurrence. Accordingly, this Court also has federal question jurisdiction over the RESPA dispute between Borrowers and Nationstar under 28 USC § 1331, and supplemental jurisdiction over the common law claims under 28 USC § 1367.

11.     All the acts and omissions that give rise to this lawsuit either occurred in Broward County, Florida or relate to real property and other business transactions located in Broward County, Florida.  Accordingly, venue is proper in this Court.

### GENERAL ALLEGATIONS

12.     Borrowers own a home located in Hollywood, Florida.  This home is subject to a first mortgage lien that was created as a result of a refinancing transaction that was consummated on April 26th, 2007.  That mortgage loan is currently serviced by Nationstar.  However, an unknown investor other than Nationstar actually owns Borrowers' mortgage loan.

13.     As a mortgage servicer, Nationstar is engaged in handling accounting, customer service, collection, and virtually all other services related to managing the residential mortgage loans in its portfolio.  For all practical purposes, Nationstar and other mortgage servicers generally appear to the borrowers whose loan they service as the mortgagee or "lender."  In fact, Nationstar frequently refers to itself as a "lender."  However, Nationstar has never loaned Borrowers any money, purchased their mortgage debt, nor engaged in any other activities that give rise to a debtor/creditor relationship. Rather, Nationstar simply services Borrowers' mortgage loans, and many other mortgage loans, as a contracted agent acting on behalf of the investors that actually own the debts. The vast majority of residential mortgage loans in the United States belong to investors and are serviced by mortgage servicers such as Nationstar and approximately 30 other competitors.  Most of these investors are  mortgage securitization trusts, sometimes referred to as "Real Estate Mortgage Investment Conduits" (REMICs), Collateralized Debt Obligations (CDOs), Collateralized Mortgage Obligations (CMOs),  or secondary market participates such as the Federal National Mortgage Association (FNMA or FannieMae) and the Federal Home Loan Mortgage Corporation (FHMLC or FreddieMac).

14.     As of the date of this pleading, Nationstar does not own Borrowers' mortgage loan. Thus, Nationstar is not a party to various contracts that give rise to the debt or security interest at issue in this case.  Accordingly, Nationstar cannot enforce the contractual jury trial waiver provisions.  Furthermore, Nationstar would not realize a financial loss if the subject mortgage loan were ultimately foreclosed and the collateral property sold for less than the balance of the loan. Instead, that loss would fall upon the investor that employs Nationstar as the loan servicer.

15.     Balboa is an insurance company.  A large portion of its income comes from selling force-placed insurance policies insuring real property that serves as the collateral for mortgage loans that are handled by mortgage servicers. Standard provisions in mortgage contracts allow the mortgagee to obtain force-placed insurance when a borrower fails to maintain the level of voluntary coverage required by the mortgage contracts. In practice, mortgage servicers, including Nationstar in this instance, purport to obtain force-placed insurance on behalf of the mortgage investors. The standard mortgage contracts also allow the mortgagee (i.e. the investor) to assess the borrower the costs of the force-placed insurance, and add that amount to the loan balance, secured by the real property.

16.     However, standard mortgage contracts never allow a mortgagee to obtain force-placed insurance when a property is part of a common ownership association that maintains a group insurance policy. Borrowers' property that gives rise to this lawsuit is part of a common ownership townhouse association that has always maintained an effective insurance policy that provides the coverage required by the relevant mortgage documents. Thus, every bit of force-placed insurance that was charged to Borrowers' account was not authorized by the relevant mortgage documents, or any other contract, agreement, statute, or regulation. This would remain

true even if the force-placed insurance was placed by the actual mortgagee instead of Nationstar. In short, the application of the force-placed insurance charges, and the related finance charges on the additional debt that Nationstar and Aurora applied to Borrowers' account, was entirely wrongful and completely illegal.

17.     Force-placed insurance is also sometimes called "lender placed insurance," however this is a misnomer because force-placed insurance is, in practice, almost always obtained by mortgage servicers and seldom obtained by mortgage investors. Indeed, as discussed in greater detail below, recently disclosed covert arrangements between mortgage servicers and force-placed insurers whereby the insurers provide kick-backs and other inducements to the mortgage servicers in order to secure their business have been criticized by large mortgage investors as being harmful to the investors' business interests.

18.     In recent years, force-placed insurance has come under fire because the industry is rife with predatory and dishonest practices that injure borrowers and mortgage investors alike. In fact, Balboa and its current corporate parent QBE Holdings Inc., are parties to a number of consent orders with state regulators and class action settlements as a result of offering kickbacks and other inducements to mortgage servicers in exchange for force-placed insurance business.  Essentially, it is common practice for Balboa and other force-placed insurers to bribe mortgage servicers to select the force-placed insurer as the exclusive provider of force-placed insurance for all loans within a given servicer's portfolio.  In exchange, Balboa and the other force-placed insurers pay unearned "commissions" to insurance agency subsidiaries of the mortgage servicer, even though the insurance agency does not perform the services that an insurance agent typically performs.

19.     Also, in order to secure force-placed insurance business, Balboa and other force-placed insurers agree to provide various insurance related services to mortgage servicers on a below cost basis.  These services include "tracking" or "monitoring" the servicers' entire portfolio to determine when a borrower has failed to maintain appropriate insurance coverage, and then placing force-placed coverage with the force-placed insurer or a subsidiary of the same entity that is performing the outsourced "tracking" services. In this case, Balboa or an affiliate, provided out-sourced "tracking" services to Aurora, and those services were improperly preformed resulting the wrongful application of force-placed insurance to Borrowers' account.

20.     Notably, these outsourced services are not limited to services related to force-placed insurance.  Balboa, or a subsidiary, also provided Aurora with "loss draft" services where it administers claims made by borrowers through their voluntary carrier when the have had a covered loss, in order to ensure that the "lender's" interest in the collateral is properly protected when the required repairs are made.

21.     In the case at bar Balboa performed tracking services for Aurora Loan Services LLC.  Because inadequate tracking caused or contributed to the wrongful force-placement, Balboa is jointly responsible with Nationstar for the wrongful purchase of force-placed insurance on Borrowers' account, and the resulting damage.

22.     The kickbacks and inducements associated with force-placed insurance are a consequence of the fact that force-placed insurance is extremely lucrative.  In fact, accordingly to publically available "loss ratio" data, Balboa's force-placed insurance portfolio in Florida is three to four times more profitable than the portfolios of admitted carriers selling residential property insurance in the voluntary market.

23.     Although it is engaged in the business of selling insurance, Balboa was either unable to bear the risk associated with flood insurance, or unwilling to do so. Accordingly, it arranged for Lexington to provide bear the underwriting risk on the policy related to Borrowers' home.

24.     Because quid-pro-quo arrangements were common in the industry at the relevant time, Borrowers allege that Lexington paid a kick back or provided other consideration to Balboa in order to be permitted to participate in its lucrative force-placed flood insurance activities.

## COUNT I – VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT AND IMPLEMENTING REGULATION X REQUIREMENTS REGARDING ERROR RESOLUTION (AGAINST NATIONSTAR)

25.     Borrowers re-allege and incorporate by reference the allegations in Paragraphs 1 through 25 above.

26.     This is an action for actual damages, statutory damages, attorney's fees and litigation costs brought pursuant to RESPA (12 U.S.C. 2605(f)).

27.     As the documents attached hereto as Exhibits "A" "B" "C" and "D" respectively demonstrate, Borrowers invoked the error resolution procedures authorized by RESPA and Regulation X (12 C.F.R 1024.35) but Nationstar failed to investigate Borrowers' concerns or correct the errors that Borrowers identified.

28.     On January 10th, 2014 the amendments to Real Estate Settlement Procedures Act (hereinafter "RESPA") that were passed through the 2010 Dodd Frank Wall Street Reform and Consumer Protection Act, along with related changes to 12 C.F.R. Part 1024 (herein after "Regulation X") became effective.

29.     However, on December 10th, 2013, one month *before* the amendments to RESPA and Regulation X became effective, Nationstar obtained a final judgment of foreclosure in the Circuit Court for the 17th, Judicial Circuit in and for Broward County, Florida against Borrowers.

30.     On February 19th, 2014, Borrowers, through undersigned counsel, sent a Qualified Written Request/Notice of Error to Nationstar (hereinafter "Notice of Error") advising Nationstar that the foreclosure complaint and judgment erroneously states Borrowers had not made a mortgage payment since July 1st, 2008.  This was erroneous because, as the Notice of Error points out, Borrowers did in fact make the scheduled monthly payments for July and August 2008, but those payments were not credited to their account.  Borrowers also explained in their Notice of Error they tendered still more of their scheduled monthly payments, but Aurora rejected those payments and returned them to Borrowers.

31.     Borrowers further pointed out in the attached Notice of Error that the errors on the account appeared to be attributable, at least in large part, to the fact that charges for force-placed insurance were inappropriately applied to Borrowers' account even though the mortgaged property is part of a townhouse association that always maintained all required insurance on the collateral building.

32.     The erroneous application for force-placed insurance is directly related to the payment application error addressed in the Notice of Error.  It is common practice for mortgage servicers to apply force-placed insurance charges to a mortgage loan balance, and then recalculate both the monthly payment and loan amortization status based on those charges.  For example, if the loan was current at the time servicer ordered force-placed insurance but the force-placed insurance charges were equal to six monthly payments, the mortgage servicer would treat

the loan as being in arrears for six monthly payments as soon as the force-placed insurance charges were applied. [1]

33.     In response to Borrowers' Notice of Error, Nationstar sent the letter attached hereto as Exhibit "B" asserting that "no error occurred" because it was somehow appropriate to apply the July and August payments to payments that were due  in April and May of 2008. Nationstar's position regarding those payments was untenable, because Borrowers *also* made the April and May payments when they were contractually due.  The Nationstar letter attached as Exhibit "B" also appears to deny that force-placed insurance charges were applied to the account despite all evidence to the contrary, and asserts that an escrow was added for "delinquent property taxes."

34.     Thereafter Borrowers, through undersigned counsel, sent a second letter to the individual at Nationstar  who responded to the Notice of Error. A true and correct copy of this letter is attached hereto as Exhibit "C." That letter points out that Nationstar's prior response was insufficient because it asserts that the June and July payments had been applied to payments due in April and May.  However,  Borrowers had paid their April and May payments on time, and therefore applying the June and July payments to April and May was clearly an error. This second letter also points out that there was documentation attached to the initial Notice of Error reflecting Aurora's purchase of a force-placed flood insurance policy with an annual premium of $5278.75.  Borrowers' second letter attached as Exhibit "C" explains that Nationstar's contention that the payment increase, failure to apply the July and August payments, and rejection of

---

[1] While Borrowers acknowledge that this practice is common, they do not acknowledge that it permitted by the applicable contracts or governing law.  To the contrary, Borrowers believe that this practice is both deceptive and unlawful, but do not challenge that practice through this lawsuit because there was never any reason for Borrowers to have been charged for any force-placed insurance.

subsequent payments could not be justified by "delinquent taxes" because the amount of the escrow advances was much more than the total amount of the property taxes, and the Broward County property appraiser's internet site indicates that the taxes were not delinquent.

35.     In response to the Borrowers' second letter attached as Exhibit "C" pointing out the serious deficiencies in Nationstar's initial response, Nationstar sent a second letter, a true and correct copy of which is attached hereto as Exhibit "D." In its second letter, Nationstar fails to address the deficiencies that Borrowers identified in Nationstar's initial response and instead asserts that it "…complied with its obligation to respond" and that "[u]nless there is new and material information that has not been provided to Nationstar Mortgage for investigation, Nationstar Mortgage considers this matter resolved."

36.     Regulation X (12 C.F.R § 1024.35 (e)) unambiguously requires that upon receipt of a Notice of Error, the servicer must respond to the notice of error by either:

> (A) Correcting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance;
>
> or
>
> (B) Conducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the Borrowers right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance.

37.     The initial purported "investigation" that Nationstar conducted in response to Borrowers' Notice of Error was not reasonable. Nationstar failed to consider the evidence that force-placed insurance charges were improperly applied to the account despite the fact that

documentary evidence was incorporated into the Notice of Error that specifically placed Nationstar on notice of that issue.  Similarly, Nationstar failed to consider the fact that the April and May payments were appropriately paid when it concluded that it was somehow appropriate to apply the payments made in July and August to those months.

38.     The gross deficiencies in Nationstar's initial purported "investigation" however are eclipsed by its response to Borrowers' second letter, where it willfully ignored the deficiencies concerning its initial response that Borrowers pointed out, and proclaimed that it "considers the matter resolved."

39.     Nationstar also violated 12 C.F.R § 1024.35 (e) by failing to correct the misapplied payments from July and August 2008, or removing the wrongfully applied force-placed insurance charges, and failing to remove inappropriate interest charges in connection with both of  these errors.  Nationstar's failure to comply with the error resolution procedures mandated by   RESPA and Regulation X are part of a pattern and practice and an award of statutory damages is  also appropriate.

WHEREFORE, Borrowers demand trial by jury and the entry of judgment in the entire amount of their damages, including statutory damages, together with an award of attorney's fees and litigation costs.

## COUNT II – VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT AND IMPLEMENTING REGULATION X REGARDING LOSS MITIGATION (AGAINST NATIONSTAR)

40.     On or about February 7th, 2014,  Borrowers submitted a loan modification to Nationstar in an effort to mitigate their damages caused by the wrongful foreclosure and retain possession and ownership of their home.

41.     Pursuant to Section 12 C.F. R. 1024.41(b), when a mortgage servicer receives a

loss mitigation application at least 45 days before a scheduled foreclosure sale, that servicer must promptly review the application to determine whether it is complete. The servicer must also notify the borrower within 5 days that the servicer acknowledges receipt of the loss mitigation application and that the servicer has determined that the application is either complete or incomplete.

42.     When a complete loss mitigation application is submitted, 12 C.F. R. 1024.41(c) requires the servicer to fully evaluate that application within 30 days.

43.     Nationstar failed to timely acknowledge that loan modification application was complete, and subsequently asserted that documents were missing even though Borrowers had repeatedly provided the precise documents Servicer requested.

44.     Nationstar failed to fully evaluate Borrowers' loss mitigation application within 30 days, and asserted that required documents were missing merely as a pretext to avoid complying with the Regulation X deadlines.

45.     A borrower is expressly authorized to enforce the loss mitigation provisions of Regulation X through section 6(f) of RESPA (12 U.S.C. 2605(f)).  This express authority is set forth in 12 C.F. R. 1024.41(a).

46.     The above cited RESPA section entitles a borrower to recover his or her actual damages, as well as attorney's fees, litigation costs, and statutory damages, in a case of a pattern or practice of non-compliance.

47.     Borrower has sustained actual damages a result of Nationstar's non-compliance. Furthermore, Nationstar's failure to comply with multiple provisions of RESPA in connection with Borrowers loss mitigation application represents a pattern and practice of non-compliance with Nationstar's obligations under RESPA and Regulation X.  Nationstar's failure to comply

with the loss mitigation procedures in Regulation represent a pattern and practice of non-compliance justifying an award of statutory damages.

WHEREFORE, Borrowers demand trial by jury and the entry of judgment in the entire amount of their damages, including statutory damages, together with an award of attorney's fees and litigation costs.

### COUNT III – WILLFUL WANTON NEGLIGENCE (AGAINST NATIONSTAR)

48.     Borrowers re-allege and incorporate by reference the allegations in Paragraphs 1 thorough 25 and 28 through 40.

49.     This is an action for damages in excess of $75,000 exclusive of interest, attorney's fees and costs.

50.     Under RESPA and Regulation X, Nationstar had a duty to reasonably investigate the concerns raised in Borrowers' Notice of Error, to complete that investigation within the statutory and regulatory deadline, and to correct the errors identified within the statutory and regulatory deadline.

51.     Instead, as its initial response indicates, Nationstar did not perform a meaningful investigation of the concerns raised in the Notice of Error and ignored highly relevant and important information that Borrowers provided.  Furthermore, in response to Borrrowers' subsequent correspondence alerting it to the deficiencies in its investigation, Nationstar willfully refused to correct the deficiencies in its investigation, choosing instead to proclaim that the matter was "resolved."

52.     Nationstar's conduct demonstrates a willful disregard, or perhaps even a calculated and intentional violation, of its statutory obligations to Borrowers.  Notably, Nationstar was made aware that the misapplied payments and improper application of force-

placed insurance would likely result in Borrowers losing the home and suffering severe economic harm as a result of a wrongful foreclosure, but it chose to disregard its investigative obligations triggered by the Notice of Error nonetheless and proceeded with full knowledge that it exposed Borrowers to harm.

53.     As a result of Nationstar's negligence, Borrowers have been damaged. Those damages are continuing and on-going, and are likely to occur again in the future.

54.     Because Nationstar's tortious acts and omissions were willful, wanton and reckless, and designed to avoid the costs and burdens associated with properly serving federally related mortgage loans and complying with Regulation X's error resolution procedures, an award of punitive damages in an amount sufficient to deter similar future wrongful conduct is necessary in order to vindicate the deterrent function of tort law.

55.     Because Nationstar is not a party to the relevant mortgage contract or promissory note, it is not entitled to assert the contractual jury trial waivers therein.

WHEREFORE, Borrowers demand trial by jury and the entry of judgment in the entire amount of their damages, including punitive damages, together with an award of the costs of this action.

### COUNT IV – VIOLATION OF FIDUCIARY DUTY (AGAINST NATIONSTAR)

56.     Borrowers re-allege and incorporate by reference the allegations in Paragraphs 1 thorough 25 and 28 through 40.

57.     This is an action for damages in excess of $75,000 exclusive of interest, attorney's fees and costs.

58.     Under Florida law, a lender generally does not owe a fiduciary to a borrower. However, an escrow holder does owes a fiduciary duty to parties to the escrow to use reasonable

care and ordinary diligence.  *See E.g. Watkins v. NCNB National Bank of Florida*,  622 So.2d 1063, 1064 (Fla. 3d DCA 1993); *Mahdavieh v. Suntrust Mortgage*, 2014 WL 1365425  *4  (S.D. Fla. April 7th, 2014)(Docket Number : 13–62801–CIV-COHN).

59.     In the case at bar, neither Nationstar nor Aurora ever acted as Borrowers' lender. However, both acted as the actual mortgagee/lender's agent.  Based on authority delegated by the mortgagee/lender that arises under the mortgage contract and promissory note, Aurora established an escrow account for purposes of paying purportedly delinquent taxes and force-placed insurance. When it acquired the servicing rights to the subject mortgage loan, Nationstar continued to maintain this escrow account.

60.     The escrow was funded with funds that were advanced by Aurora and Nationstar and secured by the mortgagee/lender's lien on Borrowers' home.

61.     Because the property was always appropriately insured by the townhouse association's insurance policies, both Aurora and Nationstar breached their duty to use reasonable care and ordinary diligence in administering Borrowers' escrow account when they purchased each and every force-placed insurance policy.  That insurance was redundant, unnecessary, and extortionately overpriced.  The charges for these insurance policies should not have been charged to Borrowers' escrow accounts.

62.     While some force-placed insurance policies were purchased outside of the applicable limitations period, others were purchased within the applicable limitations period. Pursuant to the doctrine of equitable tolling and the discovery doctrine, Borrowers should be permitted to recover for damages that flow from all wrongful purchases of force-placed insurance, including those that occurred outside of the limitations period.

63.     Borrowers' property taxes were not actually delinquent, accordingly Aurora and Nationstar breached their duty to use reasonable care and ordinary diligence concerning the establishment of an escrow account for purposes of paying any property taxes.

64.     Alternatively, if Borrowers' taxes were delinquent, the amount of that delinquency was much less than the amount that Aurora and Nationstar applied to the escrow account.

65.     Section 501.137(2), Florida Statutes requires a lender whose lien is secured by Florida real estate to notify the property owner within 15 days of receiving after receiving notification of any property taxes due.

66.     The mortgagee/lender delegated this duty to Aurora and Nationstar, however neither Aurora, Nationstar, nor the mortgagee/lender ever notified Borrowers of any overdue property taxes concerning their home.  This failure represents an additional breach of Aurora and Nationstar's duty to use reasonable care and ordinary diligence concerning their handling of Borrowers' escrow account.

67.     After Nationstar was notified through Borrowers' Notice of Error and follow-up correspondence that there were potential serious errors concerning the escrow account, Nationstar   willfully refused to investigate those errors or make the required corrections thereby once again  violating its duty to use reasonable care and ordinary diligence.  However, this latest violation   was intentional.

68.     Because Nationstar's tortious acts and omissions were willful, wanton, and reckless and designed to avoid the costs and burdens associated with properly serving federally related mortgage loans and complying with Regulation X's error resolution procedures, an award

of punitive damages in an amount sufficient to deter similar future wrongful conduct is necessary in order to vindicate the deterrent function of tort law.

WHEREFORE, Borrowers demand trial by jury and the entry of judgment in the entire amount of their damages, including punitive damages, together with an award of the costs of this action.

## COUNT V – DECLARATORY JUDGEMENT (AGAINST NATIONSTAR)

69.    Borrowers re-allege and incorporate by reference the allegations in Paragraphs 1 thorough 25 and 28 through 40.

70.    This is an action for declaratory relief brought under section 86.011,*et. seq*. Florida Statutes and 28 U.S.C. § 2201.

71.    Section 86.021, Florida Statutes provides that when a person is in doubt concerning their "…rights, status, or other equitable or legal relations [] affected by a statute, or any regulation made under statutory authority…", that person may obtain a judicial declaration of their rights and status.

72.    As a result of  Nationstar's violation of the error resolution provisions of RESPA and Regulation X described above, Borrowers are in doubt concerning their rights and status concerning the errors identified in the Notice of Error and related correspondence attached hereto as it relates to their mortgage loan account. Accordingly, Borrowers seek a judicial declaration establishing that Nationstar failed to comply with the RESPA/Regulation X error resolution procedures and it must correct the asserted errors and remove any force placed insurance charges or resulting finance charges that  flow from the improper charges immediately.

WHEREFORE Borrowers respectfully request that this Honorable Court enter a declaratory judgment directing Nationstar to remove all improper charges applied to Borrowers'

account, credit all payments that they made previously, reinstate Borrowers' mortgage loan as current, and correct all negative reports it has made to credit reporting agencies concerning Borrowers' account.

## COUNT VI -  NEGLIGENCE (AGAINST BALBOA and the QBE DEFENDANTS)

73.     Borrowers re-allege and incorporate by reference the allegations in Paragraphs 1 thorough 25 and 28 through 40.

74.     This is an action for damages in excess of $75,000 exclusive of interest, attorney's fees and costs.

75.     Although Nationstar's agreement with the mortgagee/lender require Nationstar to monitor the loans within its servicing portfolio to ensure that the borrowers maintain the required level of insurance coverage on the collateral properties,  Nationstar delegated that obligation to Balboa and/or Newport Management.  Accordingly, Nationstar, Balboa, and Newport Management are jointly and severally liable for the damages caused by the tortious mishandling of Borrowers' escrow account.  The other QBE Defendants are also liable for Balboa and Newport Management's mishandling of Borrowers' escrow account for the reasons described above, i.e.  either they have expressly assumed Balboa's liability (QBE Insurance), managed or directed Newport Management's activities (QBE Holdings and QBE FIRST); or Newport Management was acting with the course and scope of its agency relationship with the relevant QBE Defendant. (QBE Holdings and QBE FIRST).

76.     Furthermore, Borrower notified Balboa separately of the wrongful purchase of force-placed insurance and the imminent risk that it would cause Borrowers to lose their home to foreclosure and suffer related financial harm when it filed a Civil Remedy Notice of Insurer

Violation with the Florida Department of Financial Services.  Balboa received the Civil Remedy Notice and responded, but its response was superficial and evasive. A true and correct copy of the Civil Remedy Notice of Insurer Violation and Balboa's response is attached hereto as Exhibit "E."

77.     While the original purchase of inappropriate force-placed insurance may have been accidental, the failure to correct that mistake within the statutory cure period set forth by section 624.155, Florida Statues was willful.

78.     Because Balboa's and the QBE Defendants tortious conduct was intentional, Balboa and the QBE Defendants had knowledge of the risk of harm to Borrowers, and Balboa's actions were motivated by an effort to obtain unreasonable financial gain, an award of punitive damages is justified in order to deter future wrongful conduct of a similar nature.

WHEREFORE, Borrowers demand trial by jury and the entry of judgment in the entire amount of their damages, including punitive damages, together with an award of the costs of this action.

## COUNT VII – VIOLATION OF FIDUCIARY DUTY (AGAINST BALBOA AND THE QBE DEFENDANTS)

79.     Borrowers re-allege and incorporate by reference the allegations in Paragraphs 1 thorough 25 and 26 through 40 and 59 – 68.

80.     This is an action for damages in excess of $75,000 exclusive of interest, attorney's fees, and costs.

81.     Although Nationstar's agreement with the mortgagee/lender require Nationstar to monitor the loans within its servicing portfolio to ensure that the borrowers maintain the required level of insurance coverage,  Nationstar delegated that obligation to Balboa and/or Newport Management. The other QBE Defendants are also liable for Balboa and Newport Management's

mishandling of Borrowers' escrow account for the reasons described above, i.e. either they have expressly assumed Balboa's liability (QBE Insurance), managed or directed Newport Management's activities (QBE Holdings and QBE FIRST); or Newport Management was acting with the course and scope of its agency relationship with the relevant QBE Defendant. (QBE Holdings and QBE FIRST).

82.     Furthermore, Borrower notified Balboa separately of the wrongful purchase of force-placed insurance and the imminent risk that it would cause Borrowers to lose their home to foreclosure and suffer related financial harm when it filed a Civil Remedy Notice of Insurer Violation with the Florida Department of Financial Services. Balboa received the Civil Remedy Notice and responded, but is response was superficial and evasive. A true and correct copy of the Civil Remedy Notice of Insurer Violation and Balboa's response is attached hereto as Exhibit "E."

83.     While the original purchase of inappropriate force-placed insurance may have been accidental, the failure to correct that mistake within the statutory cure period set forth by section 624.155, Florida Statues was willful. Because Balboa and the QBE Defendants' tortious conduct was intentional, Balboa and the QBE Defendants' had knowledge of the risk of harm to Borrowers, and Balboa's actions were motivated by an effort to obtain unreasonable financial gain, an award of punitive damages is justified in order to deter future wrongful conduct of a similar nature.

84.     Because Aurora delegated its fiduciary duty to handle Borrowers' escrow account to Balboa, Balboa is jointly and severally liable with Aurora and Nationstar for the mishandling of that account, the wrongful force-placement, and all errors that flow therefrom.

WHEREFORE, Borrowers demand trial by jury and the entry of judgment in the entire amount of their damages, including punitive damages, together with an award of the costs of this action.

## COUNT VIII – TORTIOUS INTEREFERENCE WITH A BUSINESS RELATIONSHIP (AGAINST BALOBA)

85.     Borrowers re-allege and incorporate by reference the allegations in Paragraphs 1 thorough 25 and 28 through 40 and through 36 and 59 – 68.

86.     This is an action for damages in excess of  $75,000 exclusive of interest, attorney's fees, and costs.

87.      Balboa had knowledge of the relationship between the mortgagee/lender, Aurora and Borrowers. Balboa is not a party to the mortgage contracts or to any contract between Aurora, the mortgage/lender, and Borrowers.  Nor is Balboa a third-party beneficiary to any contracts between Borrowers, the mortgagee/lender, and Aurora.

88.     But even if Balboa were arguably not a stranger to the business relationship between Borrowers and the mortgagee/lender, its interference is not justified or privileged because it was not acting under the mortgagee/lender's instructions and its actions were done in bad faith.

89.     Furthermore, Balboa was acting in concert with Aurora in connection with its force-placed insurance activities, and its actions were contrary to the interests of Aurora's principal.

90.     In order to secure the right to provide lucrative force-placed insurance for the loans within Aurora's servicing portfolio, Aurora offered to provide free or subsidized insurance related mortgaging services, including but not limited to the insufficient tracking services that

resulted in the wrongful force-placement of insurance on Borrowers' home and materially

contributed to the subsequent wrongful foreclosure.

91.     By effectively bribing Aurora in order to secure the right to provide lucrative

force-placed insurance to the loans within its servicing portfolio, Balboa intentionally and

unjustifiably interfered with the contractual relationship between the Borrowers and the

mortgagee/lender by encouraging Aurora to improperly inflate the amount of money that

Borrowers owed on their mortgage loan and dramatically increasing the risk that their mortgage

loan would go into default thereby damaging both Borrowers and the mortgagee/lender.

92.     Although it did not directly provide the force-placed flood insurance itself, Balboa

received compensation from Lexington for allowing it to provide the force-placed flood

insurance on Borrowers' home.

93.     As a result of Balboa tortious interference in their business relationship with the

mortgagee/lender, Borrowers have been damaged.  These damages include the fact that the

wrongfully force-placed flood insurance has been added to their mortgage balance and is

included in the judgment that the state court has entered against them, and as a result they are at

risk of losing their home.

94.     Borrowers filed a Civil Remedy Notice of Insurer Violation with the Florida

Department of Financial Services and Balboa responded to that Civil Remedy Notice.  A true

and correct copy of both the Notice and Response are attached hereto as Exhibit "E."

95.     While its response indicates that Balboa was aware of the issue, Balboa took no

action to correct its errors or mitigate the harm that those errors caused and will continue to

cause Borrowers, despite the obvious fact that prompt and responsible corrective action could

have dramatically reduced the risk that Borrowers would lose their home through as a result of

the wrongful application of force-placed insurance charges.

96.     Because Balboa's tortious conduct was intentional, Balboa had knowledge of the risk of harm to Borrowers, and Balboa's actions were motivated by an effort to obtain unreasonable financial gain, an award of punitive damages is justified in order to deter future wrongful conduct of a similar nature.

WHEREFORE, Borrowers demand trial by jury and the entry of judgment in the entire amount of their damages, including punitive damages, together with an award of the costs of this action.

## COUNT IX – TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP (AGAINST LEXINGTON)

97.     Borrowers re-allege and incorporate by reference the allegations in Paragraphs 1 through 25 above.

98.     This is an action for damages in excess of $75,000 exclusive of attorney's fees and costs.

99.      Lexington had knowledge of the relationship between the mortgagee/lender, Aurora and Borrowers. Lexington is not a party to the mortgage contracts or to any contract between Aurora, the mortgage/lender, and Borrowers.  Nor is Lexington a third-party beneficiary to any contracts between Borrowers, the mortgagee/lender, and Aurora.

100.     In order to secure the right to provide lucrative force-placed windstorm insurance for the loans within Aurora's servicing portfolio, Lexington agreed to share a portion of its profits with Balboa or a subsidiary

101.     By effectively bribing Balboa in order to leverage its relationship with Aurora and

thereby to secure the right to provide lucrative force-placed windstorm insurance to the loans within its servicing portfolio at Borrowers' and other similarly situated borrowers' expense, Lexington intentionally and unjustifiably interfered with the contractual relationship between the Borrowers and the mortgagee/lender by encouraging Aurora to improperly inflate the amount of money that Borrowers owed on their mortgage loan and dramatically increasing the risk that their mortgage loan would go into default thereby damaging both Borrowers and the mortgagee/lender.

102.    As a result of Lexington's tortious interference in their business relationship with the mortgagee/lender, Borrowers have been damaged.  These damages include the fact that the wrongfully force-placed flood insurance, and the extortionately inflated premiums associated with that force-placed insurance, have been added to their mortgage balance and is included in the judgment that the state court has entered against them, and as a result they are now at risk of losing their home.

103.    Borrowers filed a Civil Remedy Notice of Insurer Violation against Lexington with the Florida Department of Financial Services. A true and correct copy of that Civil Remedy Notice and Lexington's response is attached hereto as Exhibit "F."   Through the Civil Remedy Notice,  Lexington was advised of the harm its tortious misconduct caused to the Borrowers, and given the opportunity to mitigate that harm by prompt and responsible corrective action. However, as the attached response reflects, Lexington intentionally chose not to take any corrective action.

104.    Because Lexington's tortious conduct was intentional, Lexington had knowledge of the risk of harm to Borrowers, and Lexington's actions were motivated by an effort to obtain unreasonable financial gain, an award of punitive damages is justified in order to deter future

wrongful conduct of a similar nature.

WHEREFORE, Borrowers demand trial by jury and the entry of judgment in the entire amount of their damages, including punitive damages, together with an award of the costs of this action.

## COUNT XI – UNJUST ENRICHMENT (AGAINST LEXINGTON)

105.    Borrowers re-allege and incorporate Paragraphs 1 – 25 above as if fullly set forth herein and further allege as follows.

106.    Lexington has received a benefit at the expense of Borrower, and has knowledge thereof. This benefit includes the extortionate premium paid for flood insurance when Lexington never took an underwriting risk whatsoever because its coverage was superseded by the townhouse association's master policy.

107.    The circumstances are such that it would be inequitable for Lexington to retain the benefit without paying the value thereof to Borrowers.

WHEREFORE, Borrowers demand trial by jury and the entry of judgment in the entire amount of their damages, together with an award of the costs of this action.

## COUNT XII – VIOLATION OF SECTION 624.155 AND 626.9551(1)(a), Florida Statutes (AGAINST LEXINGTON)

108.    Borrowers re-allege and incorporate Paragraphs 1 – 25 above as if fully set forth herein and further allege as follows.

109.    This is an action for actual damages, attorneys' fees and litigation costs  pursuant to section 626.9551(1)(d) and 624.155, Florida Statutes 2013.

110.    Section 626.9551(1)(a) prohibits persons engaged in the business of insurance in Florida from:

> [r]equir[ing], as a condition precedent or condition subsequent to
> the lending of money or extension of credit or any renewal thereof,
> that the person to whom such money or credit is extended, or
> whose obligation the creditor is to acquire or finance, negotiate any
> policy or contract of insurance through a particular insurer or
> group of insurers or agent or broker or group of agents or brokers.

111.    Lexington violated that statute when it conspired with Aurora and Balboa to force Borrowers to purchase the subject windstorm insurance policy as a condition subsequent to their Aurora serviced mortgage loan.

112.    Borrower filed a Civil Remedy Notice of Insurer Violation with the Florida Department of Financial Services.  The Department accepted that notice.  Lexington has responded. Both the Civil Remedy Notice and Lexington's response is attached hereto as Exhibit "F."  That response however is evasive and insufficient and substantially the same as a recommended boiler-plate response that the attorney who filed the Civil Remedy Notice on Lexington's behalf recommends on its internet site. A true and correct copy of the relevant document taken on Lexington's counsel's internet site is attached hereto as Exhibit "G."  Such a substance-free response is tantamount to no response at all.

113.    By conspiring with Aurora to charge an extortionate premium for redundant flood insurance, Lexington has violated section 626.9551(1)(d), and caused damage to Borrowers thereby.

WHEREFORE, Borrowers demand trial by jury and the entry of judgment in the entire amount of their damages, together with an award of attorney's fees and the costs of this action.


## DEMAND FOR TRIAL BY JURY

Borrowers demand trial by jury on all claims so triable.

Respectfully Submitted,


THE LAW OFFICES OF JEFFREY N. GOLANT, P.A.

1000 W. McNAB RD. STE. 150
POMPANO BEACH, FL 33069
Phone:  (954) 942-5270
Fax:      (954) 942-5272
Email:    jgolant@jeffreygolantlaw.com
By: **/S/ JEFFREY N. GOLANT ESQ.**
Fla. Bar. No. 0707732
Attorney for Plaintiffs John Berene and Camron Longson


<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the foregoing Second Amended Complaint

was filed with the Clerk of Court using CM/ECF and served via notice of electronic filing

generated by the CM/ECF system on the following counsel of record identified below on

October 1st,  2014.


Henry H Bolz, IV ESQ.
Akerman Senterfitt
350 East Las Olas Blvd.
Suite 1600
Fort Lauderdale, FL 33301
(954) 468-2463
Email: henry.bolz@akerman.com
Attorney for Defendant Nationstar Mortgage LLC.

Katherine L. Halliday ESQ.
BuckleySandler, LLP
1250 24th Street, NW
Suite 700
Washington, DC 20037
202-349-8000
Email: khalliday@buckleysandler.com
Attorney for Defendant Balboa Insurance Company

William Newton Shepherd ESQ.
Holland & Knight LLP
222 Lakeview Avenue
Suite 1000

West Palm Beach, FL 33401-3208
561-650-8338
Fax: 561-650-8399
Email: william.shepherd@hklaw.com
Attorney for Defendant Balboa Insurance Company

Brian W. Toth ESQ.
Holland & Knight
701 Brickell Avenue
Suite 3000
Miami, FL 33131
305-374-8500
Email: brian.toth@hklaw.com
Attorney for Defendant Balboa Insurance Company

Steven Jeffrey Brodie ESQ.
Carlton Fields Jorden Burt, PA
100 SE Second Street
Suite 4200
Miami, FL 33131
305-530-0050
Fax: 305-530-0055
Email: sbrodie@cfjblaw.com


Daniel Gonzalo Enriquez ESQ.
Carlton Fields Jorden Burt, P.A.
100 S.E. Second Street
Suite 4200
Miami, FL 33131
305-530-0050
Fax: 305-530-0055
Email: denriquez@cfjblaw.com


**/S/ Jeffrey Golant**