## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

JOHN BERENE and                           CASE NO.:    14-61153-CIV-SCOLA
CAMRON LONGSON,

      Plaintiffs,

vs.

NATIONSTAR MORTGAGE LLC,
NEWPORT MANAGEMENT
CORPORATION, AND SOUTHWEST BUSINESS
CORPORATION,
All Foreign Corporations,

      Defendants

_____/

### THIRD AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

Plaintiffs John Berene and Camron Longson by and through undersigned counsel hereby file their Third Amended Complaint.  Plaintiffs sue Defendants Nationstar Mortgage LLC, Newport Management Corporation, and Southwest Business Corporation and allege as follows:

### THE PARTIES, JURISIDICTION, AND VENUE

1.      Plaintiffs John Berene and Camron Longson are natural persons over the age of 21.  They are citizens of the State of Florida and reside in Broward County, Florida.  These Plaintiffs will be referred to hereafter as "Borrowers."

2.      Defendant Nationstar Mortgage LLC is a Delaware limited liability company whose members are also Delaware limited liability companies.  This Defendant and its members are wholly owned by NSM Holdings Inc., a Delaware corporation with its principal place of business in the State of Texas. Defendant Nationstar Mortgage LLC is also the successor in interest to Aurora Loan Services LLC., which has become insolvent since it engaged in all of the

acts and omissions that are relevant to this lawsuit. Defendant Nationstar Mortgage LLC is engaged in servicing federally related mortgage loans secured by real property throughout the United States and the State of Florida, including the territorial jurisdiction of this Court.  As a mortgage servicer, it is subject to specific federal laws and administrative regulations governing its mortgage serving activities. These laws and regulations include, but are not limited to, the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 *et. seq*. (hereinafter RESPA) and Regulation X, 12 C.F.R part 1024, (hereinafter "Regulation X"). At all material times, Defendant Nationstar Mortgage LLC, or its predecessor  Aurora Loan Services, LLC, serviced Borrowers' mortgage loan secured by real property located  in Broward County, Florida.  Nationstar engages in substantial business activity in the State of  Florida and the territorial jurisdiction of this Court, and is therefore subject to this Court's  jurisdiction.  Defendant Nationstar Mortgage LLC will be referred to hereafter as "Nationstar."

      3.     Defendant Newport Management Corporation is a California corporation with its principal place of business in the State of California. Prior to June of 2011, this Defendant was a wholly owned subsidiary of Bank of America Corporation. Prior to the June 2011 transaction between Bank of America Corporation and QBE Holdings, this Defendant was an alter-ego of Balboa Insurance Company, it had the exact same officers and directors, and many (if not all) of the employees of  one entity also worked for the other. Even after that transaction, Newport Management has continued to act in concert with Balboa Insurance Company in connection with both companies continuing force-placed insurance activities.   This Defendant provides outsourced insurance tracking services to mortgage servicers, including at all material times to Aurora, on a subsidized basis as  part of a quid pro quo arrangement whereby the mortgage servicer would be pay a nominal fee, while permitting Newport Management Corporation and its

affiliates to receive commissions and revenue from force-placed insurance transactions. This Defendant will be referred to hereinafter as "Newport  Management."

4.      Defendant Southwest Business Corporation is a Texas Corporation with its principal place of business in the State of Texas.  This Defendant is engaged in the business of distributing and marketing force-placed insurance products, and engages in substantial business activity within the State of Florida and the territorial jurisdiction of this Court. This Defendant will be referred to hereinafter as "Southwest."

5.      This is an action for damages in excess of $75,000, exclusive of interest, attorney's fees, and costs. All Defendants are citizens of states other than Florida, while Plaintiffs are citizens of the State of Florida and of no other state.  Accordingly, this Court has diversity jurisdiction pursuant to 28 USC§ 1332 over all claims raised herein.  In addition, Borrowers assert claims against Nationstar under the  Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2601 *et. seq*. and related claims  under the common law of the State of Florida that arise from the same transaction and  occurrence. Accordingly, this Court also has federal question jurisdiction over the RESPA  dispute between Borrowers and Nationstar under 28 USC § 1331, and supplemental jurisdiction  over the common law claims under 28 USC § 1367.

6.      All the acts and omissions that give rise to this lawsuit either occurred in Broward County, Florida or relate to real property and other business transactions located in Broward County, Florida.  Accordingly, venue is proper in this Court.

## GENERAL ALLEGATIONS

7.      Borrowers own a home located in Hollywood, Florida.  This home is subject to a first mortgage lien that was created as a result of a refinancing transaction that was consummated on April 26th, 2007.  That mortgage loan is currently serviced by Nationstar.  However, an

unknown investor other than Nationstar actually owns Borrowers' mortgage loan.

8.      As a mortgage servicer, Nationstar is engaged in handling accounting, customer service, collection, and virtually all other services related to managing the residential mortgage loans in its portfolio.  For all practical purposes, Nationstar and other mortgage servicers generally appear to the borrowers whose loan they service as the mortgagee or "lender."  In fact, Nationstar frequently refers to itself as a "lender."  However, Nationstar has never loaned Borrowers any money, purchased their mortgage debt, nor engaged in any other activities that give rise to a debtor/creditor relationship. Rather, Nationstar simply services Borrowers' mortgage loans, and many other mortgage loans, as a contracted agent acting on behalf of the investors that actually own the debts. The vast majority of residential mortgage loans in the United States belong to investors and are serviced by mortgage servicers such as Nationstar and approximately 30 other competitors.  Most of these investors are  mortgage securitization trusts, sometimes referred to as "Real Estate Mortgage Investment Conduits" (REMICs), Collateralized Debt Obligations (CDOs), Collateralized Mortgage Obligations (CMOs),  or secondary market participants such as the Federal National Mortgage Association (FNMA or FannieMae) and the Federal Home Loan Mortgage Corporation (FHMLC or FreddieMac).

9.      As of the date of this pleading, Nationstar does not own Borrowers' mortgage loan. Thus, Nationstar is not a party to various contracts that give rise to the debt or security interest at issue in this case.  Accordingly, Nationstar cannot enforce the contractual jury trial waiver provisions.  Furthermore, Nationstar would not realize a financial loss if the subject mortgage loan were ultimately foreclosed and the collateral property sold for less than the balance of the loan. Instead, that loss would fall upon the investor that employs Nationstar as the loan servicer.

10.     Standard mortgage contracts, including those used for Borrowers' mortgage loan, permit the mortgagee to obtain insurance whenever a borrower fails to maintain adequate coverage, and to charge the costs of that insurance to the borrower. However, the relevant contracts do not allow mortgagee to obtain force-  placed insurance when a property is part of a common ownership association that maintains a group insurance policy adequately insuring the collateral property. Borrowers' property that gives rise to this lawsuit is part of a common ownership townhouse association that has always maintained an effective insurance policy that provides the coverage required by the relevant mortgage documents. Thus, every bit of force-placed insurance that was charged to Borrowers' account was not authorized by the relevant mortgage documents, or any other contract, agreement, statute, or regulation. This would remain true even if the force-placed insurance was placed by the actual mortgagee instead of Nationstar. In short, the application of the force-placed insurance charges, and the related finance charges on the additional debt that Nationstar and Aurora applied to Borrowers' account, was entirely wrongful and completely illegal.

11.     Force-placed insurance is also sometimes called "lender placed insurance," however this is a misnomer because force-placed insurance is, in practice, almost always obtained by mortgage servicers and seldom obtained by mortgage investors. Indeed, as discussed in greater detail below, recently disclosed covert arrangements between mortgage servicers and force-placed insurers whereby the insurers provide kick-backs and other inducements to the mortgage servicers in order to secure their business have been criticized by large mortgage investors as being harmful to the investors' business interests.

12.     In recent years, force-placed insurance has come under fire because the industry is rife with predatory and dishonest practices that injure borrowers and mortgage investors alike.

In fact, Newport Management's corporate parent QBE Holdings Inc., is a party to a number of  consent orders with state regulators and class action settlements as a result of offering kickbacks and other inducements to mortgage servicers in exchange for force-placed insurance  business.  Essentially, it is common practice for force-placed insurers and affiliates to pay unearned commissions to the entity, or an affiliate, authorized to place force-placed insurance on behalf of a mortgage servicer.  Here, Newport Management was the entity authorized to place force-placed insurance on behalf of Aurora, and Southwest paid Aurora unearned commissions.

13.     In the case at bar, Newport Management agreed to provide various insurance related services to Aurora on a  below cost basis.  These services include "tracking" or "monitoring" Aurora's entire portfolio in order to determine when a borrower has failed to maintain appropriate insurance coverage,  and then placing force-placed coverage with an entity affiliated with Newport Management.  When hazard insurance was placed by Newport Management it was placed with its affiliate Balboa Insurance Company.  However, since Balboa insurance company was not in the business of providing flood insurance, Newport Management utilized Southwest to procure flood insurance from a number of other providers.  Southwest selected various different insurers during the relevant time period.

14.     As consideration for performing tracking services for Aurora, Newport Management received a service fee from Aurora.  However, Newport Management entered into a separate agreement with Southwest whereby it received "commissions"  calculated as percentage of all force-placed insurance coverage that it procured after determining (correctly or not) that the borrower had failed to maintain sufficient voluntary coverage.  Notably, at the material times, New Management's "commission" income far exceeded its income from fees

paid for tracking services.

15.     Under section 626.112, Florida Statutes, Newport Management was required to obtain an appropriate license as an insurance agency from the Florida Department of Financial Services in order to perform the services it agreed to perform for Southwest, or to receive commission in connection with insurance transactions insuring risks located in the State of Florida.  However, Newport Management did not, at any material time, have the required insurance license.

16.     During the years 2008 through 2012, Borrowers' townhouse association maintained voluntary flood insurance coverage through Florida admitted carriers that participated in the National Flood Insurance Program.  Each of these policies provided $250,000 worth of coverage at a cost of less than $500 per year.

17.     However, during that same period Newport Management and Southwest procured duplicative force-placed flood insurance that cost more than ten times that amount several times during that time period.

18.     While a licensed insurance agent typically attempts to locate insurance the most favorable terms for the insurance consumer, Newport Management and Southwest did the exact opposite in connection with the insurance on Borrowers' loan. Newport Management and Southwest obtained a series of grossly inflated and duplicative force-placed flood insurance policies at a premium that was approximately ten times higher than the cost of superior voluntary coverage available through Florida admitted carriers participating in the National Flood Insurance Program. Newport and Southwest selected these overpriced and inferior policies solely to enrich themselves at the expense of both Borrowers and the investor who owned their mortgage debt.  Their collusion and self-

dealing resulted in Borrowers being charged unaffordable premiums for duplicative and unnecessary force-placed insurance which ultimately pushed them into foreclosure.

19.     The kickbacks and inducements associated with force-placed insurance are a consequence of the fact that force-placed insurance is extremely lucrative.  In fact, accordingly to  publically available "loss ratio" data, Balboa Insurance Company's force-placed insurance business produce three to four times more profit than a typical voluntary insurer in Florida would earn from providing similar insurance.

20.     Southwest entered into a contract with Newport Management whereby Newport Management would procure force-placed flood insurance from various third party insurance companies through Southwest.  In exchange for placing force-placed insurance business with Southwest, Newport was rewarded with a "commission"-- despite the fact that it did not perform any of the services that an insurance agent typically performs, or even have a Florida insurance license.  Thus, these "commission" were entirely unearned.  These payments were not really commissions, but instead thinly disguised kickbacks.

21.     During the years 2008, 2009, 2010, 2011, and 2012 Southwest and Newport Management procured duplicative force-placed flood insurance covering Plaintiffs' property, and the related premiums were charged to their mortgage loan account.  As noted above, these premiums were more than 10 times the cost of superior coverage offered through Florida admitted insurers participating in the National Flood Insurance Program.

22.     Aurora treated the premiums for the force-placed flood insurance as "additional debt." As a result of these excessive and improperly assessed force-placed flood insurance charges, Aurora commenced a foreclosure action against Borrowers.  After Aurora went out of business, Nationstar began servicing Borrowers mortgage loan and continued to prosecute

the foreclosure action.

23.    During this litigation, Newport Management has confirmed that all of the force-placed insurance charges were placed in error, and indicated that they were to be removed. However, as recently as July 7th, 2015 Nationstar indicated that Borrowers were entitled to additional escrow credits, but those credits had not yet been processed or applied to Borrowers' account.

## COUNT I – VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT  AND IMPLEMENTING REGULATION X REQUIREMENTS REGARDING ERROR  RESOLUTION (AGAINST NATIONSTAR)

24.    Borrowers re-allege and incorporate by reference the allegations in Paragraphs 1 through 23 above.

25.    This is an action for actual damages, statutory damages, attorney's fees and litigation costs brought pursuant to RESPA (12 U.S.C. 2605(f)).

26.    As the documents attached hereto as Exhibits "A" "B" "C" and "D" respectively demonstrate,  Borrowers invoked the error resolution procedures authorized by RESPA and Regulation X (12 C.F.R 1024.35)  but Nationstar failed to investigate Borrowers' concerns or correct the errors that Borrowers identified.

27.    On January 10th, 2014 the amendments to Real Estate Settlement Procedures Act (hereinafter "RESPA") that were passed through the 2010 Dodd Frank Wall Street Reform and Consumer Protection Act, along with related changes to 12 C.F.R. Part 1024 (herein after "Regulation X") became effective. However, on December 10th, 2013, one month *before* the amendments to RESPA  and Regulation X became effective, Nationstar obtained a final judgment of foreclosure in the  Circuit Court for the 17th, Judicial Circuit in and for Broward County, Florida against Borrowers.  That judgment was later vacated, by consent, after the parties entered

into a loan modification agreement.

28.     On February 19th, 2014, Borrowers, through undersigned counsel, sent a Qualified
Written Request/Notice of Error to Nationstar (hereinafter "Notice of Error") advising
Nationstar  that the foreclosure complaint and judgment erroneously states Borrowers had not
made a  mortgage payment since July 1st, 2008.  This was erroneous because, as the Notice of
Error  points out, Borrowers did in fact make the scheduled monthly payments for July and
August  2008, but those payments were not credited to their account.  Borrowers also
explained in their  Notice of Error they tendered still more of their scheduled monthly
payments, but Aurora  rejected those payments and returned them to Borrowers.

29.     Borrowers further pointed out in the attached Notice of Error that the errors on
the  account appeared to be attributable, at least in large part, to the fact that charges for force-
placed  insurance were inappropriately applied to Borrowers' account even though the
mortgaged  property is part of a townhouse association that always maintained all required
insurance on the  collateral building.

30.     The erroneous application for force-placed insurance is directly related to the
payment application error addressed in the Notice of Error.  It is common practice for mortgage
servicers to apply force-placed insurance charges to a mortgage loan balance, and then
recalculate both the monthly payment and loan amortization status based on those charges. For
example, if the loan was current at the time force-placed insurance was placed but the force-
placed insurance charges were equal to six monthly payments, the mortgage servicer would treat
the loan as being in arrears for six monthly payments as soon as the force-placed insurance
charges were applied.[1]

---

[1] While Borrowers acknowledge that this practice is common, they do not acknowledge that it

31.     In response to Borrowers' Notice of Error, Nationstar sent the letter attached hereto as Exhibit "B" asserting that "no error occurred" because it was somehow appropriate to apply the July and August payments to payments that were due in April and May of 2008. Nationstar's position regarding those payments was untenable, because Borrowers *also* made the April and May payments when they were contractually due. The Nationstar letter attached as Exhibit "B" also appears to deny that force-placed insurance charges were applied to the account despite all evidence to the contrary.

32.     Thereafter Borrowers, through undersigned counsel, sent a second letter to the individual at Nationstar who responded to the Notice of Error. A true and correct copy of this letter is attached hereto as Exhibit "C." That letter points out that Nationstar's prior response was insufficient because it asserts that the June and July payments had been applied to payments due in April and May. However, Borrowers had paid their April and May payments on time, and therefore applying the June and July payments to April and May was clearly an error. This second letter also points out that there was documentation attached to the initial Notice of Error reflecting Aurora's purchase of a force-placed flood insurance policy with an annual premium of $5278.75. Borrowers' second letter attached as Exhibit "C" explains that Nationstar's contention that the payment increase, failure to apply the July and August payments, and rejection of subsequent payments could not be justified by "delinquent taxes" because the amount of the escrow advances was much more than the total amount of the property taxes, and the Broward County property appraiser's internet site indicates that the taxes were not delinquent.

33.     In response to the Borrowers' second letter attached as Exhibit "C" pointing out

---

was permitted by the applicable contracts or governing law. To the contrary, Borrowers believe that this practice is both deceptive and unlawful, but do not challenge that practice through this lawsuit because there was never any reason for Borrowers to have been charged for any force-placed insurance.

the serious deficiencies in Nationstar's initial response, Nationstar sent a second letter, a true and

correct copy of which is attached hereto as Exhibit "D."  In its second letter, Nationstar fails to

address the deficiencies that Borrowers identified in Nationstar's initial response and instead

asserts that it "…complied with its obligation to respond" and that "[u]nless there is new and

material information that has not been provided to Nationstar Mortgage for investigation,

Nationstar Mortgage considers this matter resolved."

      34.    Regulation X (12 C.F.R § 1024.35 (e)) unambiguously requires that upon receipt

of a Notice of Error, the servicer must respond to the notice of error by either:

> (A)  Correcting the error or errors identified by the borrower and
> providing the borrower with a written notification of the
> correction, the effective date of the correction, and contact
> information, including a telephone number, for further assistance;
>
> or
>
> (B)  Conducting a reasonable investigation and providing the
> borrower with a written notification that includes a statement that
> the servicer has determined that no error occurred, a statement of
> the reason or reasons for this determination, a statement of the
> Borrowers right to request documents relied upon by the servicer
> in reaching its determination, information regarding how the
> borrower can request such documents, and contact information,
> including a telephone number, for further assistance.

      35.    The initial purported "investigation" that Nationstar conducted in response to

Borrowers' Notice of Error was not reasonable. Nationstar failed to consider the evidence that

force-placed insurance charges were improperly applied to the account despite the fact that

documentary evidence was incorporated into the Notice of Error that specifically placed

Nationstar on notice of that issue.  Similarly, Nationstar failed to consider the fact that the April

and May payments were appropriately paid when it concluded that it was somehow appropriate

to apply the payments made in July and August to those months.

36.     The gross deficiencies in Nationstar's initial purported "investigation" however are eclipsed by its response to Borrowers' second letter, where it willfully ignored the deficiencies concerning its initial response that Borrowers pointed out, and proclaimed that it "considers the matter resolved."

37.     Nationstar also violated 12 C.F.R § 1024.35 (e) by failing to correct the misapplied payments from July and August 2008, or removing the wrongfully applied force-placed insurance charges, and failing to remove inappropriate interest charges in connection with both of these errors. Nationstar's failure to comply with the error resolution procedures mandated by RESPA and Regulation X are part of a pattern and practice and an award of statutory damages is also appropriate.

WHEREFORE, Borrowers demand trial by jury and the entry of judgment in the entire amount of their damages, including statutory damages, together with an award of attorney's fees and litigation costs.

## COUNT II – VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT AND IMPLEMENTING REGULATION X REGARDING LOSS MITIGATION (AGAINST NATIONSTAR)

38.     Borrowers re-allege and incorporate by reference the allegations in Paragraphs 1 through 23 and 26 through 37.

39.     On or about February 7th, 2014,  Borrowers submitted a loan modification to Nationstar in an effort to mitigate their damages caused by the wrongful foreclosure and retain possession and ownership of their home.

40.     Pursuant to Section 12 C.F. R. 1024.41(b), when a mortgage servicer receives a loss mitigation application at least 45 days before a scheduled foreclosure sale, that servicer must promptly review the application to determine whether it is complete. The servicer must also

notify the borrower within 5 days that the servicer acknowledges receipt of the loss mitigation application and that the servicer has determined that the application is either complete or incomplete.

41.     When a complete loss mitigation application is submitted, 12 C.F.R. 1024.41(c) requires the servicer to fully evaluate that application within 30 days.

42.     Nationstar failed to timely acknowledge that loan modification application was complete, and subsequently asserted that documents were missing even though Borrowers had repeatedly provided the precise documents Servicer requested.

43.     Nationstar initially failed to fully evaluate Borrowers' loss mitigation application within 30 days, and asserted that required documents were missing merely as a pretext to avoid complying with the Regulation X deadlines. After Borrowers filed this lawsuit, Nationstar ultimately approved Borrowers' loss mitigation application.

44.     A borrower is expressly authorized to enforce the loss mitigation provisions of Regulation X through section 6(f) of RESPA (12 U.S.C. 2605(f)). This express authority is set forth in 12 C.F.R. 1024.41(a).

45.     The above cited RESPA section entitles a borrower to recover his or her actual damages, as well as attorney's fees, litigation costs, and statutory damages, in a case of a pattern or practice of non-compliance.

46.     Borrower has sustained actual damages a result of Nationstar's non-compliance. These damages include emotional distress and legal expenses associated with continued efforts to avoid the foreclosure sale.

WHEREFORE, Borrowers demand trial by jury and the entry of judgment in the entire amount of their damages, including statutory damages, together with an award of attorney's fees

and litigation costs.

### COUNT III –NEGLIGENCE PER SE (AGAINST NATIONSTAR)

47.     Borrowers re-allege and incorporate by reference the allegations in Paragraphs 1 through 23 and 26 through 37 and 39 through 46.

48.     This is an action for damages in excess of $75,000 exclusive of interest, attorney's fees and costs.

49.     Under RESPA and Regulation X, Nationstar had a duty to reasonably investigate the concerns raised in Borrowers' Notice of Error, to complete that investigation within the statutory and regulatory deadline, and to correct the errors identified within the statutory and regulatory deadline.

50.     Instead, as its initial response indicates, Nationstar did not perform a meaningful investigation of the concerns raised in the Notice of Error and ignored highly relevant and important information that Borrowers provided.  Furthermore, in response to Borrrowers' subsequent correspondence alerting it to the deficiencies in its investigation, Nationstar willfully refused to correct the deficiencies in its investigation, choosing instead to proclaim that the matter was "resolved."

51.     Nationstar's conduct demonstrates a willful disregard, or perhaps even a calculated and intentional violation, of its duty to Borrowers, codified by RESPA and Regulation X, to reasonably investigate borrower assertions of errors and, where appropriate, to timely correct those errors. Notably, Nationstar was made aware that the misapplied payments and improper application of force-placed insurance would likely result in Borrowers losing the home and suffering severe economic harm as a result of a wrongful foreclosure, but it chose to disregard its investigative obligations triggered by the Notice of Error nonetheless and proceeded

with full knowledge that it exposed Borrowers to foreseeable injury.

52.    As a result of Nationstar's negligence, Borrowers have been damaged. Those damages include legal fees and costs associated with the challenging the wrongfully assessed force-placed insurance premiums applied to their mortgage loan account.

53.    Because Nationstar's tortious acts and omissions were willful, wanton and reckless, and designed to avoid the costs and burdens associated with properly servicing federally related mortgage loans and complying with Regulation X's error resolution procedures, an award of punitive damages in an amount sufficient to deter similar future wrongful conduct is necessary in order to vindicate the deterrent function of tort law.

54.    Because Nationstar is not a party to the relevant mortgage contract or promissory note, it is not entitled to assert the contractual jury trial waivers therein.

WHEREFORE, Borrowers demand trial by jury and the entry of judgment in the entire amount of their damages, including punitive damages, together with an award of the costs of this action.

## COUNT VI - NEGLIGENCE (AGAINST NEWPORT MANAGEMENT)

55.    Borrowers re-allege and incorporate by reference the allegations in Paragraphs 1 through 23, 26 through 37, 39 through 46, and 48 through 54.

56.    This is an action for damages in excess of $75,000 exclusive of interest, attorney's fees and costs.

57.    Although Nationstar's agreement with the mortgagee/lender require Nationstar to monitor the loans within its servicing portfolio to ensure that the borrowers maintain the required level of insurance coverage on the collateral properties, Nationstar delegated that obligation to Newport Management.

58.     Furthermore, Borrower notified Balboa Insurance Company separately of the wrongful purchase of force-placed insurance and the imminent risk that it would cause Borrowers to lose their home to foreclosure and suffer related financial harm when it filed a Civil Remedy Notice of Insurer Violation with the Florida Department of Financial Services. Balboa received the Civil Remedy Notice and responded, but its response was superficial and evasive. A true and correct copy of the Civil Remedy Notice of Insurer Violation, along with Balboa's response is attached hereto as Exhibit "E."

59.     While the original purchase of inappropriate force-placed insurance may have been accidental, the failure to correct that mistake within the statutory cure period set forth by section 624.155, Florida Statues was willful.  Because Balboa Insurance Company's personnel and operations are closely integrated with Newport Management's own personnel and operations, Newport Management knew, or should have known, about the issues Borrowers raised in the Civil Remedy Notice.

60.      Newport Management's inappropriate placement of force-placed insurance on Borrowers' account, and its subsequent failure to remove those charges, was willful, wanton or reckless.  Furthermore, Newport Management had knowledge of the risk of harm to Borrowers, and Newport Management's actions were motivated by an effort to obtain unreasonable financial gain, an award of punitive damages is justified in order to deter future wrongful conduct of a similar nature.

WHEREFORE, Borrowers demand trial by jury and the entry of judgment in the entire amount of their damages, including punitive damages, together with an award of the costs of this action.

## COUNT VIII – TORTIOUS INTEREFERENCE WITH A BUSINESS RELATIONSHIP (AGAINST NEWPORT MANAGEMENT AND SOUTHWEST)

61.     Borrowers re-allege and incorporate by reference the allegations in Paragraphs 1 through 23, 26 through 37, 39 through 46, 48 through 54, and 56 through 60.

62.     This is an action for damages in excess of $75,000 exclusive of interest, attorney's fees, and costs.

63.     Newport Management and Southwest had knowledge of the relationship between the mortgagee/lender, Aurora and Borrowers. None of these Defendants are a party to the mortgage contracts, or a third party beneficiary under these contracts.

64.     But even if Newport Management and Southwest were arguably not strangers to the business relationship between Borrowers and the mortgagee/lender, their interference was not justified or privileged because neither was not acting under the mortgagee/lender's instructions and their actions were done in bad faith.

65.     Furthermore, these Defendants were acting in concert with Aurora in connection with its force-placed insurance activities, and these actions were contrary to the interests of Aurora's principal, because they greatly increased the risk that Borrowers would be unable to make the mortgage payments, which could cause the Aurora's principal to sustain a financial loss due to the mortgage default.  This is particularly true because the amount of the mortgage debt is significantly higher than the value of Borrowers' home.

66.     In order to secure the right to provide lucrative force-placed insurance for the loans within Aurora's servicing portfolio, Newport Management offered to provide  subsidized insurance tracking services, to Aurora, thereby reducing the cost of its servicing operations and increasing its profit.  As part of that arrangement, Aurora delegated to Newport Management the

right to select the force-placed insurance provider whenever it determined (correctly or otherwise) that there had been a lapse.

67.     In order to exploit Newport Management's ability to select the force-placed insurance provider, Southwest offered to pay Newport Management unearned (and illegal) commissions in exchange for placing insurance through Southwest.

68.     Southwest and Newport then placed unreasonably overpriced force-placed insurance that cost more than 10 times the cost of readily available insurance products providing superior coverage.   The selection of this product was unreasonable, and done solely to increase Southwest and Newport's profits, at the expense of both Borrowers and the mortgagee/investor.

69.     At least 39% of the cost associated with the force-placed insurance is directly attributable to the unearned commissions or kickbacks that were paid to Southwest and Newport, despite the fact that neither entity performed any bona fide services for which an insurance agent typically receives a commission.

70.     Southwest and Newport Management tortuously interfered with Borrower's relationship with the mortgagee/investor by dramatically inflating the cost of the force-placed flood insurance and improperly dividing much of the inflated premiums among themselves. Although Borrowers should not have been required to pay for any force-placed insurance, the excessive amounts of the force-placed insurance charged in the case at bar caused, or substantially contributed to, the foreclosure.  If Southwest and Newport Management had charged only the much lower costs associated with superior coverage available from Florida admitted carriers that participate in the National Flood Insurance program,  the resulting expense would not have caused the foreclosure.

71.     In addition, by bribing Newport Management to procure force-placed insurance,

Southwest encouraged Newport Management to adopt unsound tracking policies which caused or contributed to the wrongful force-placement in the case at bar.

72.     As a result of Southwest and Newport's tortious interference in their business relationship with the mortgagee/lender, Borrowers have been damaged. These damages include the costs associated with defending themselves from the wrongful foreclosure and costs and finance charges added to their mortgage balance.

73.     Borrowers filed a Civil Remedy Notice of Insurer Violation with the Florida Department of Financial Services and Balboa responded to that Civil Remedy Notice. A true and correct copy of both the Notice and Response are attached hereto as Exhibit "E."

74.     Because Southwest and Newport Management's tortious interference in the business relationship between Borrowers and the mortgagee was intentional, both had knowledge of the risk of harm to Borrowers, and both Southwest and Newport's actions were motivated by an effort to obtain unreasonable financial gain.  Accordingly, an award of punitive damages is justified in order to deter future wrongful conduct of a similar nature.

WHEREFORE, Borrowers demand trial by jury and the entry of judgment in the entire amount of their damages, including punitive damages, together with an award of the costs of this action.

## DEMAND FOR TRIAL BY JURY

75.     Borrowers demand trial by jury on all claims so triable.

Respectfully Submitted,

THE LAW OFFICES OF JEFFREY N. GOLANT, P.A.

1999 N. UNIVERSITY DRIVE. STE. 213
CORAL SPRINGS, FL 33071
Phone:  (954) 942-5270
Fax:     (954) 942-5272
Email:   jgolant@jeffreygolantlaw.com
By: **/S/ JEFFREY N. GOLANT ESQ.**
Fla. Bar. No. 0707732
Attorney for Plaintiffs John Berene and Camron Longson

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Third Amended Complaint

was filed with the Clerk of Court using CM/ECF and served via notice of electronic filing

generated by the CM/ECF system on the following counsel of record identified below on August

6th, 2015.

Henry H Bolz, IV ESQ.
Akerman Senterfitt
350 East Las Olas Blvd.
Suite 1600
Fort Lauderdale, FL 33301
(954) 468-2463
Email: henry.bolz@akerman.com
Attorney for Defendant Nationstar Mortgage LLC.

Katherine L. Halliday ESQ.
BuckleySandler, LLP
1250 24th Street, NW
Suite 700
Washington, DC 20037
202-349-8000

Email: khalliday@buckleysandler.com
Attorney for Defendant Balboa Insurance Company

William Newton Shepherd ESQ.
Holland & Knight LLP
222 Lakeview Avenue
Suite 1000
Attorney for Defendant Balboa Insurance Company

**/s/ Jeffrey Golant**